# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

DIANE EXENDINE,          )
                                )
      Plaintiff,             )
                                )
      vs.                      )          Case No. 4:08CV00906 CAS(LMB)
                                )
MICHAEL J. ASTRUE,         )
**Commissioner of Social Security,**   )
                                )
      Defendant.          )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Diane Exendine for a Period of Disability and Disability Insurance Benefits under Title II of the Social Security Act. The cause was referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a Brief in Support of the Complaint. (Document Number 14). Defendant has filed a Brief in Support of the Answer. (Doc. No. 19). Plaintiff has also filed a Reply. (Doc. No. 20).

## Procedural History

On April 30, 2004, plaintiff filed her application for Title II benefits, claiming that she became unable to work due to her disabling condition on April 3, 1999.[1] (Tr. 87-90). This claim

---

[1]Plaintiff also filed an application for Supplemental Security Income benefits under Title XVI, which was granted. (Tr. 24-27).

was denied on October 18, 2004.  (Tr. 60-63).  On March 19, 2005, an ALJ issued a favorable

decision.  (Tr. 24-27).  On June 16, 2005, the Appeals Council of the Social Security

Administration (SSA) vacated the ALJ's decision and remanded the case back to an ALJ for

further consideration.  (Tr. 47-48).  On July 24, 2006, plaintiff amended her alleged onset date to

July 1, 1993.  (Tr. 31).  On September 15, 2006, after an administrative hearing, a different ALJ

found that plaintiff was not entitled to disability insurance benefits during the period from July 1,

1993, through December 31, 1996, plaintiff's date last insured.  (Tr. 14-19).  Plaintiff then filed a

request for review of the ALJ's decision with the Appeals Council, which was denied on April 18,

2008.  (Tr. 10, 4-7).  Thus, the decision of the ALJ stands as the final decision of the

Commissioner.  See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.    ALJ Hearing

Plaintiff's administrative hearing was held on July 24, 2006.  (Tr. 1321).  Plaintiff was

present and was represented by counsel.  (Id.).  The ALJ noted that the subject of the hearing was

plaintiff's impairments that allegedly prevented her from working from 1993 to 1996.  (Tr. 1322).


Plaintiff's attorney then examined plaintiff, who testified that she was not alleging a

physical basis for disability.  (Id.).  When asked whether she had any psychiatric illnesses, plaintiff

testified that she was put on Haldol[2] in 1993.  (Tr. 1323).  Plaintiff stated that she did not know

why she was put on Haldol.  (Id.).  Plaintiff testified that Dr. Picinbono put her on Haldol.  (Id.).

---

[2]Haldol is indicated for the treatment of schizophrenic patients who require prolonged
parenteral antipsychotic therapy.  See Physician's Desk Reference (PDR), 2499 (59th Ed. 2005).

Plaintiff stated that she saw Dr. Picinbono for two or three years, until she left the country. (Id.). Plaintiff testified that she went to Dr. Picinbono because her husband was abusing her. (Id.). Plaintiff stated that the Haldol caused her to sleep a lot. (Tr. 1324).

Plaintiff stated that she did not remember if she went to the hospital for any psychiatric problem between 1993 and 1996. (Id.). Plaintiff testified that the Haldol was too strong and prevented her from working during the relevant time period. (Id.). Plaintiff stated that she would have been too sleepy to work. (Tr. 1325). Plaintiff testified that she slept fifteen hours a day during the relevant time period and that she took naps. (Id.). Plaintiff stated that when she was awake, her concentration was "okay," and her memory was "good." (Id.).

Plaintiff testified that she was on Haldol injections from 1993 through 1998, when she was seeing Dr. Picinbono. (Id.). Plaintiff stated that she was put on pills in 1998 by Dr. Rashmi Nakra and that she was put back on the injections in 1999, when she stopped working. (Tr. 1326). Plaintiff testified that she stopped working in 1999 because the company was getting ready to have a lay-off. (Id.).

Plaintiff stated that Dr. Picinbono is a psychiatrist. (Id.). Plaintiff's attorney stated that he was not sure how to spell this doctor's name, as he could find no reference to the doctor. (Id.). Plaintiff's attorney stated that he has no record as to the existence of this doctor. (Id.).

Plaintiff testified that she started seeing Dr. Picinbono in 1993 and that she started seeing Dr. Nakra in 1995 or 1996. (Id.). Plaintiff stated that she saw Dr. Nakra at Barnes Hospital on an outpatient basis. (Tr. 1327).

Plaintiff testified that she was unable to work during the relevant period because she was really tired and slept a lot. (Id.).

The ALJ then examined plaintiff, who testified that she was on Haldol injections at the time of the hearing. (Id.). Plaintiff stated that she was not taking any other medication. (Id.). Plaintiff testified that she was able to remember birthdays and the current date but she did not know how the Haldol otherwise affected her memory. (Id.). Plaintiff stated that she was unable to remember dates she was hospitalized or similar information. (Id.). Plaintiff testified that the Haldol makes her sleepy and affects her memory. (Tr. 1328).

The ALJ asked plaintiff whether her testimony was questionable due to her memory problems, to which plaintiff responded that she did not know. (Id.). The ALJ stated that there were no medical records for the time period at issue and that he was relying entirely on plaintiff's memory, which was of questionable reliability. (Id.).

The ALJ next examined the vocational expert, Jeffrey Magrowski, who testified that he had heard plaintiff's testimony. (Tr. 1329). Dr. Magrowski stated that the file indicated an assembly work job, where plaintiff sat and assembled electronics from 1978 to 1987. (Id.). The ALJ noted that the file revealed a position at Bac Tech testing electronic parts. (Tr. 1330). Plaintiff testified that, at this position, she worked in a dark room and assembled electronics on a machine. (Id.). Plaintiff stated that she also tested the equipment. (Id.).

Dr. Magrowski testified that from 1978 to 1987 plaintiff worked as an assembler assembling electronic components, which was a semi-skilled sedentary position. (Id.). Dr. Magrowski stated that plaintiff also tested electronic parts, which was a semi-skilled, sedentary position. (Tr. 1332).

Dr. Magrowski testified that plaintiff next worked as an order picker, picking orders in a warehouse, which was a light position. (Tr. 1335).

Dr. Magrowski stated that plaintiff also worked as a laborer, which was a medium position. (Id.).

The ALJ stated that plaintiff had no physical impairments but had mental impairments according to her testimony, although there were no medical records to support this. (Tr. 1336). The ALJ stated that it appears that plaintiff would be limited to medium unskilled work. (Id.). Dr. Magrowski noted that plaintiff's past positions of order picker and laborer were medium and unskilled, although plaintiff performed the order picker work at a light level. (Id.).

Plaintiff's attorney then questioned Dr. Magrowski. (Tr. 1337). Plaintiff's attorney stated that Dr. Robert Cottone, the state agency medical expert, found that plaintiff met a listing as of at least 2001. (Id.). Plaintiff's attorney noted that Dr. Cottone was unable to go back further due to the absence of medical records. (Id.). Plaintiff's attorney asked Dr. Magrowski whether plaintiff's aggressive disorganized behavior, well-documented paranoid schizophrenia,[3] with long periods of delusions would interfere with full-time work in every industry. (Tr. 1338). Dr. Magrowski responded, "I really can't answer that." (Id.).

Plaintiff's attorney then made a final statement. Plaintiff's attorney argued that plaintiff meets a listing, as she was found to have met a listing at a later date by the state agency medical consultant. (Id.). Plaintiff's attorney claimed that the onset date should be determined by comparing the work record, the medical evidence, and the testimony of plaintiff. (Id.). Plaintiff's attorney stated that plaintiff's work stopped in 1991, which supports his argument that plaintiff's

---

[3]A common type of psychosis, characterized by abnormalities in perception, content of thought, and thought processes (hallucinations and delusions) and by extensive withdrawal of interest from other people and the outside world, with excessive focusing on one's own mental life. Stedman's Medical Dictionary, 1729 (28th Ed. 2006).

disability began then. (Tr. 1339). Plaintiff's attorney stated that, although plaintiff did not receive treatment for a while, it was noted by a psychologist in the record that plaintiff's impairment interferes with her treatment because she becomes delusional. (Id.).

## B.   **Relevant Medical Records**[4]

The record reveals that plaintiff presented to the emergency room at Malcolm Bliss Mental Health Center (Missouri Department of Mental Health) ("Malcolm Bliss") on August 27, 1980. (Tr. 755-62). Plaintiff was taken to the hospital by her mother due to recent bizarre behavior. (Tr. 755). Plaintiff reported feeling depressed for several months. (Id.). Earni S. Pal, M.D. diagnosed plaintiff with adjustment reaction of adult life with depressive features, rule out dysthymic disorder.[5] (Tr. 756). Dr. Pal recommended that plaintiff be seen regularly for antidepressant therapy and psychotherapy. (Id.).

On October 24, 1991, plaintiff was taken to Malcolm Bliss emergency room. (Tr. 751-54). Plaintiff reported that her symptoms of fear of people and situations had exacerbated and that she had called 911. (Tr. 751). It was noted that plaintiff had a long history of psychotic illness and was followed by Dr. Aqeeb Ahmad. (Id.). Four previous psychiatric admissions were noted. (Id.). M. Wetzel, M.D. diagnosed plaintiff with schizophrenia, chronic, undifferentiated type, severe without psychotic features. (Tr. 753). Dr. Wetzel found that plaintiff was not suicidal, homicidal, or

---

[4]All of the medical evidence discussed below was submitted to the Appeals Council after the ALJ issued his decision. The only medical evidence available to the ALJ was evidence dated after 1999, subsequent to the expiration of plaintiff's insured status.

[5]A chronic disturbance of mood characterized by mild depression or loss of interest in usual activities. Stedman's at 569.

psychotic to the degree of posing risks to her self.  (Id.).  He discharged plaintiff to see Dr. Ahmad on an outpatient basis.  (Id.).

Plaintiff presented to Malcolm Bliss emergency room on January 6, 1992, very paranoid, and stating "get away from me.  Don't cut off my arms." (Tr. 729).  Plaintiff was found to be breaking into a stranger's house on the day prior to admission.  (Id.).  Plaintiff became acutely agitated and paranoid when the police confronted her and tried to punch the police officers.  (Id.).  Plaintiff was forcibly removed and brought to the emergency room.  (Id.).  Plaintiff believed that the house she was breaking into was her own house.  (Id.).  Plaintiff's mother reported that plaintiff had been wandering the streets, driving late at night, and driving on the lawns of houses.  (Id.).  Plaintiff's mother indicated that plaintiff had been noncompliant with medication.  (Id.).  It was noted that plaintiff had a diagnosis of schizophrenia.  (Id.).  Plaintiff was found to be delusional, and endorsed auditory hallucinations and thought withdrawal.  (Id.).  Plaintiff was diagnosed with schizophrenia, with a GAF score[6] of 25.[7]  (Tr. 733).  Plaintiff was given Haldol and her symptoms improved rather quickly.  (Tr. 730).  Plaintiff was discharged in stable condition on January 14, 1992.  (Id.).

Plaintiff was seen at Malcolm Bliss for follow-up on February 7, 1992.  (Tr. 725-26).  Plaintiff reported that she had presented at Hopewell as arranged upon her discharge but she was unable to

---

[6]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations."  Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[7]A GAF score of 21 to 30 denotes "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)."  DSM-IV at 32.

be seen there because she did not live in the proper area. (Id.). Plaintiff denied all psychotic symptoms. (Tr. 725). Plaintiff was diagnosed with schizophrenia, chronic, undifferentiated type, in partial remission. (Tr. 726). Plaintiff requested and received Haldol. (Id.).

On November 27, 1993, plaintiff presented to the emergency room at DePaul Health Center, where she was described as "fit for confinement" after being in a motor vehicle accident. (Tr. 709). Plaintiff reported being afraid of voices threatening to "cut off her head." (Tr. 710). Plaintiff had injuries to her face, nose and mouth, and alleged that some of her injuries were caused by her husband. (Id.). Plaintiff was diagnosed with schizophrenia with acute psychosis and was transferred to Malcolm Bliss. (Tr. 720).

Plaintiff was transferred to Malcolm Bliss on November 27, 1993, where she was found to be having an acute exacerbation of schizophrenia, chronic, undifferentiated type. (Tr. 704). It was noted that plaintiff typically had command hallucinations with paranoid content. (Id.). It was reported that plaintiff's doctor had recently closed practice and plaintiff had not followed up with Haldol injections for at least a month. (Id.). Plaintiff reported that she had been unable to sleep for three to four days and that she felt very paranoid of her husband and police. (Id.). Plaintiff was found to exhibit speech latency, bewildered affect, and an anxious mood. (Id.). Plaintiff was diagnosed with schizophrenia, chronic, undifferentiated type, severe without psychotic features. (Id.). Plaintiff was transferred to Barnes Hospital. (Id.).

On September 6, 2006, Aqeeb Ahmad, M.D. completed a Mental Medical Source Statement. (Tr. 1315-1318). Dr. Ahmad found that plaintiff had moderate limitations in her ability to maintain reliability, relate in social situations, interact with the general public, maintain socially acceptable behavior, understand and remember simple instructions, make simple work-related decisions, maintain

regular attendance and be punctual, complete a normal workday and workweek without interruptions from symptoms, and sustain an ordinary routine without special supervision. (Tr. 1316-1317). Dr. Ahmad found that plaintiff had marked limitations in her ability to cope with normal work stress, function independently, behave in an emotionally stable manner, accept instructions and respond to criticism, maintain attention and concentration for extended periods, perform at a consistent pace without an unreasonable number and length of rest periods, respond to changes in work setting, and work in coordination with others. (<u>Id.</u>). Dr. Ahmad indicated that plaintiff had experienced four or more episodes of decompensation that year. (Tr. 1317). Dr. Ahmad listed plaintiff's diagnosis as paranoid schizophrenia. (Tr. 1318). Dr. Ahmad stated that plaintiff "feels people play games with her, gets suspicious and delusional; cannot maintain concentration, e.g. forgets what has been done or not done." (<u>Id.</u>). Dr. Ahmad expressed the opinion that plaintiff's limitations had existed at the assessed severity for "about 25 years." (<u>Id.</u>).

### The ALJ's Determination

The ALJ made the following findings:

1.  The claimant last met the insured status requirements of the Social Security Act on December 31, 1996.

2.  The claimant did not engage in substantial gainful activity during the period from his alleged onset date of July 1, 1993 through his date last insured of December 31, 1996 (20 CFR 404.1520(b) and 404.1571 *et seq.*).

3.  Through the date last insured, the objective medical evidence fails to establish the existence of a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms (20 CFR 404.1520(c)).

4.  The claimant was not under a "disability," as defined in the Social Security Act, at any time from July 1, 1993, the alleged onset date, through December 31, 1996, her date last insured (20 CFR 404.1520(c)).

(Tr. 16-19).

The ALJ's final decision reads as follows:

> Based on the application for a period of disability and disability insurance benefits protectively filed on April 22, 2004, the claimant was not disabled under sections 216(I) and 223(d) of the Social Security Act through December 31, 1996, the date last insured.

(Tr. 19).

## Discussion

### A.      Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).   The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."  Id.

### B.      The Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c)), 416.920 (c)). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his

or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform

the previous work, in consideration of the claimant's residual functional capacity (RFC) and the

physical and mental demands of the past work, the claimant is not disabled.  See id.  If the

claimant cannot perform his or her previous work, the final step involves a determination of

whether the claimant is able to perform other work in the national economy taking into

consideration the claimant's residual functional capacity, age, education and work experience.

See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if

s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains

upon the claimant until s/he adequately demonstrates an inability to perform previous work, at

which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform

other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

   The Commissioner has supplemented this five-step process for the evaluation of claimants

with mental impairments.  See 20 C.F.R. §§ 404.1520a (a), 416.920a (a).  A special procedure

must be followed at each level of administrative review.  See id.  Previously, a standard document

entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this

special procedure, had to be completed at each level and a copy had to be attached to the ALJ's

decision, although this is no longer required.  See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e),

416.920a (d), (d) (2), (e).  Application of the special procedures required is now documented in

the decision of the ALJ or Appeals Council.  See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

   The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a,

416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms,

findings, functional limitations, and effects of treatment" in the case record to assist in the

determination of whether a mental impairment exists.  See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1).  If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace.  See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).  Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.  See id.  Next, the Commissioner must determine the severity of the impairment based on those ratings.  See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).

If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.  See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.  See id.  If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

## C.    Plaintiff's Claims

Plaintiff first argues that the ALJ erred in finding that plaintiff had not established the existence of a severe impairment during the relevant period.  Plaintiff also argues that the ALJ failed to fully develop the record.  Plaintiff contends that the Appeals Council erred in failing to

consider all of the new and material evidence that was submitted directly to it. Plaintiff finally

argues that the Appeals Council erred in failing to properly weigh or explain the weight given to

the opinion of the treating physician.

In order to be entitled to a Period of Disability and Disability Insurance Benefits, a

claimant must be insured for disability. See 20 C.F.R. §§ 404.315, 404.320. Thus, in order to

receive disability insurance benefits, a claimant must show onset of disability before the expiration

of insured status. See Pyland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998). In this case, plaintiff

must show an onset of disability prior to December 31, 1996, plaintiff's last date of insured status.

The ALJ found at step two of the sequential evaluation that plaintiff had no severe

impairments at the time her insured status expired. (Tr. 17). Step two of the sequential

evaluation process requires a determination of whether the claimant suffers from a medically

severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c), 416.920 (c).

To qualify as severe, the impairment must significantly limit the claimant's mental or physical

ability to do "basic work activities." Id. While the burden is not great, the claimant bears the

burden at step two to demonstrate a severe impairment that significantly limits the ability to

perform basic work activities. See Mittlestedt v. Apfel, 204 F.3d 847, 852 (8th Cir. 2000);

Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001). The sequential evaluation process may

be terminated at step two when the claimant's impairment or combination thereof would have no

more than a minimal effect on the claimant's ability to work. See Simmons v. Massanari, 264

F.3d 751, 755 (8th Cir. 2001).

In this case, the ALJ noted that plaintiff's attorney attempted to obtain medical evidence

from multiple medical sources, but was unable to produce any medical evidence from the period

at issue-July 1, 1993, through December 31, 1996. (Tr. 18). The ALJ stated that the earliest evidence obtained was from June 10 to 18, 1999, years after plaintiff's date last insured. (Id.). The ALJ further stated that, while medical evidence from after the alleged onset date can be related back to the date last insured, the record fails to demonstrate that plaintiff's medical evidence from 1999 and later accurately describes her impairments and functioning during the relevant period. (Id.). The ALJ found that plaintiff did not sustain her burden of proving that she had a medically determinable severe impairment or severe combination of impairments by the time her insured status expired on December 31, 1996. (Id.). The ALJ again emphasized that his decision was based on the fact that plaintiff "produced no abnormal medical signs or laboratory findings from July 1, 1993 through December 31, 1996 or for years thereafter." (Id.).

At the time the ALJ rendered his decision, his finding that the evidence did not establish the existence of a severe impairment during the relevant period was supported by substantial evidence. Subsequent to the ALJ's decision, however, plaintiff obtained additional medical evidence that was submitted to the Appeals Council. This evidence included treatment notes from Malcolm Bliss and DePaul Health Center revealing several psychiatric hospitalizations from 1980 through 1993, along with Dr. Ahmad's medical source statement in which he expressed the opinion that plaintiff's condition had existed for about 25 years.

Title 20 C.F.R. § 416.1476(b) provides that "[i]n reviewing decisions based on an application for benefits, the Appeals Council will consider the evidence in the [ALJ] hearing record and any new and material evidence only if it relates to the period on or before the date of the [ALJ] hearing decision." "To be 'new,' evidence must be more than merely cumulative of other evidence in the record." Bergmann v. Apfel, 207 F.3d 1065, 1069 (8th Cir. 2000). "To be

'material,' the evidence must be relevant to [the] claimant's condition for the time period for which benefits were denied." Id. "Where . . . the Appeals Council considers new evidence but denies review, [the Court] must determine whether the ALJ's decision was supported by substantial evidence on the record as a whole, including the new evidence." Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir. 2007).

In its order denying plaintiff's request for review, the Appeals Council indicated that it had received the following additional evidence: (1) "Records from DePaul Health Center dated November 1993;" and (2) "Mental Medical Source Statement from Dr. Ahmad dated September 7, 2006." (Tr. 3). The order does not refer to any of the new records from Malcolm Bliss.

In Lamp v. Astrue, 531 F.3d 629 (8th Cir. 2008), the Appeals Council's decision noted that it had considered a dated exhibit as new evidence but did not specify whether that exhibit included an undated letter that was also submitted. Id. at 632. This undated letter included an explanation that the ALJ had requested. Id. at 633. The case was remanded to the district court with instructions to remand it to the Appeals Council because the court was "unable to discern whether the Appeals Council considered this new and material evidence." Id. Further, in Gartman v. Apfel, 220 F.3d 918, 922 (8th Cir. 2000), a case was remanded to the district court with instructions to remand it to the Appeals Council when the Council's decision simply referred to "additional evidence" but did not specify whether that additional evidence included a doctor's new and material evidence that had been submitted to the Council after the ALJ's adverse decision.

The evidence of plaintiff's treatment at Malcolm Bliss is clearly new. The undersigned finds that this evidence is also material. The evidence reveals four psychiatric admissions at

Malcolm Bliss and one follow-up visit. Plaintiff's first psychiatric admission was in August 1980, when plaintiff was taken to the hospital by her mother due to bizarre behavior. (Tr. 755-62). Plaintiff was next taken to the emergency room at Malcolm Bliss in October 1991, due to symptoms of fear and situations, at which time she was diagnosed with schizophrenia. (Tr. 751-54). Plaintiff was admitted at Malcolm Bliss from January 6, 1992 through January 14, 1992, after she was found breaking into a house due to an exacerbation of her symptoms of schizophrenia. (Tr. 729-30). Plaintiff was treated with Haldol. (Tr. 730). Plaintiff was seen at Malcolm Bliss for follow-up on February 7, 1992. (Tr. 725-26). Plaintiff was transferred to Malcolm Bliss from DePaul Health Center on November 27, 1993, where she was found to be having an acute exacerbation of schizophrenia. (Tr. 704). It was noted that plaintiff experienced hallucinations with paranoid content. (Id.).

This evidence is significant because it demonstrates that plaintiff was treated for a mental impairment prior to the expiration of her insured status. The ALJ based his decision that plaintiff did not have a severe impairment during the relevant period on the fact that there were no medical records from this period and the earliest medical record was from 1999. The records from Malcolm Bliss demonstrate that plaintiff was treated for a mental impairment as early as 1980 and that plaintiff was diagnosed with schizophrenia in 1991. Plaintiff experienced an exacerbation in her schizophrenia in 1992 and in 1993. Because the evidence of plaintiff's treatment at Malcolm Bliss is both new and material and because it cannot be determined whether the Appeals Council considered this evidence, the case must be reversed and remanded to the ALJ.

Further, the Appeals Council indicated that it considered records from DePaul Health Center dated November 1993 and the Mental Medical Source Statement from Dr. Ahmad dated

September 7, 2006.  The records from DePaul Health Center reveal that plaintiff presented to the emergency room on November 27, 1993 following a motor vehicle accident, at which time she was described as "fit for confinement."  (Tr. 709).  Plaintiff reported being afraid of voices that were threatening to "cut off her head."  (Tr. 710).  Plaintiff was diagnosed with schizophrenia with acute psychosis.  (Tr. 720).  This evidence is dated within the relevant period.  In his Source Statement, Dr. Ahmad found that plaintiff had moderate and marked limitations due to her schizophrenia.  (Tr. 1316-1317).  Dr. Ahmad expressed the opinion that plaintiff's mental limitations had existed at the assessed severity for "about 25 years."  (Tr. 1318).  This evidence is significant as the ALJ noted in his opinion that the record failed to demonstrate that the medical evidence from 1999 and later accurately described her impairments and functioning during the relevant period.  (Tr. 18).  Given this new evidence, the ALJ's determination that plaintiff did not have a medically determinable severe impairment by the time her insured status expired on December 31, 1996 is not supported by substantial evidence.

Accordingly, the undersigned recommends that this matter be reversed and remanded to the ALJ in order for the ALJ to consider the new evidence and proceed with the five-step process to determine if plaintiff's severe impairment of schizophrenia was disabling prior to the expiration of plaintiff's insured status.

# RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that pursuant to sentence four of 42 U.S.C. § 405 (g), the decision of the Commissioner be **reversed** and this case be **remanded** to the Commissioner for further proceedings consistent with this Report and Recommendation.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

Dated this   10th   day of February, 2010.

Lewis M. Blanton

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE